Essex County Court of Quarter Sessions.

STATE OF NEW JERSEY v. MICHAEL LISENA, DEFENDANT.

Decided May 5, 1943.

For the state, *James McKenna.*

For the defendant, *John J. Clancy.*

FLANNAGAN, C. P. J.   The defendant was convicted under *R. S.* 2:105–1 of using instruments with intent to produce an

abortion and sentenced on the seventh day of April, 1943, to imprisonment. A writ of error was taken out and was presented to the court on April 30th, 1943, at which time a motion was argued for a "certificate of reasonable doubt."

No petition or grounds of the motion were presented to the court, as indicated as the preferable practice in *State* v. *Baer,* 6 *N. J. Mis. R.* 29; 140 *Atl. Rep.* 563, but the grounds were stated orally and argued orally. The grounds appear in the stenographer's transcript of the motion.

The motion is made under *R. S.* 2:195–11; *N. J. S. A.* 2:195–11, which contemplates that in the event the trial judge denies the motion a motion for the same relief may be made to the Supreme Court Justice presiding in the county and that the trial judge state his reasons for such denial, in order, apparently, that the same may be presented to such justice on such motion before him. It is in compliance with this requirement that the reasons for the denial of the motion are now stated in this opinion.

"The sole question to be considered upon an application of this character is whether or not there is a reasonable doubt in the mind of the trial judge as to the validity of the conviction. It is neither the importance, character, nor gravity of the point involved, nor whether the point should, in the opinion of the trial judge, be reviewed by a higher court. It is the state of mind of the trial judge which must determine the question. He must have not only a doubt, but a reasonable doubt, as to the validity of the conviction; otherwise, the certificate should be refused." *State* v. *Baer, supra* (at *p.* 30); 140 *Atl. Rep.* (at *p.* 564).

The first ground upon which the motion was made is that it was error for the trial judge to refuse to grant the motion of defendant, made at the opening of the trial, to quash the indictment as duplicitous or as multifarious. Conceding for argument that the indictment be regarded as multifarious, the motion was addressed to the discretion of the court and there was plainly no abuse of discretion. There had been a previous trial and the defendant was thoroughly familiar with the state's case. He was well aware of the fact that the state's proof was that an instrument was used by defendant and defendant could not have been prejudiced in maintaining

his defense on the merits by the form in which the indictment was found. The language objected to in the indictment is as follows: "that Michael Lisena * * * did use in and upon the said June Kowalski divers instruments and means, to the Grand Jurors aforesaid unknown."

The second ground argued is that the court erred in the admission of certain testimony.

The state called as a witness a physician, Dr. Gauzza, an associate gynecologist, who treated June Kowalski, the abortee, while on the staff of the hospital where she had been taken by a relative for treatment because of a bleeding condition from her female organ.

The state did not refer in its examination-in-chief of Dr. Gauzza to the history given by the abortee to this physician preliminary to treatment, but the defendant's counsel, himself, opened the subject and asked the doctor on cross-examination.

"Q. Did she inform you Doctor that she had been to another doctor before she came to the hospital? A. No."

This question referred to a Dr. Hoffman to whom the abortee testified she had been and who at the time of the trial had joined the army and could not be produced, and who the defendant's attorney during the trial suggested was responsible for the abortee's condition.

Continuing, the defendant's attorney asked:

"Q. Did she inform you she had taken pills? A. She did not."

The question may have referred to some quinine pills which the abortee testified she took or may have referred to some pills given her by Dr. Hoffman, which she testified she did not take.

The prosecutor on redirect examination then immediately asked the doctor, "Q. What information did you get from her, Doctor?" to which he replied, "A. That she had it done. By whom we do not know." Two other questions on a different subject were then asked by the prosecutor, when the court asked, "The court—What do you mean by she had it done? What did she tell you?" Up to this point no objection by defendant was made. The witness answered:

"The witness: That it came from natural causes—it came through criminal—[interrupted].

"Mr. Bozza: I object.

"The court: Strike out the word criminal. Through physical interference?

"The witness: Through physical interference."

The information as to whether the bleeding condition of the girl's female organ was due to natural causes, drugs, or to physical interference (trauma), was obviously information reasonably necessary for intelligent diagnosis and treatment, for which purpose the abortee was in the hospital, and being questioned by the treating physician.

It is a daily and approved practice in the trial courts for treating physicians to be permitted to testify to the history given them by patients necessary for the purpose of diagnosis or treatment. Miscarriage may be caused by disease from within as well as from physical interference or trauma from without, and that the very limited information disclosed in the instant case, viz., that there had been some physical interference, was necessary, seems as plain as would be the case if a patient asked for treatment at the hands of a doctor for a swollen ankle or for a bump on the head. The natural and necessary inquiry would be whether it arose from within or by reason of physical force from without. The information given the doctor by June Kowalski was as circumscribed as could serve the essential purposes within the limits of reasonable necessity. The patient did not disclose whether the physical interference was by herself or by some one else, or by what means, and she gave no names. Dr. Gauzza testified, "By whom we do not know."

It is argued that *State* v. *Ludwig*, 85 *N. J. L.* 18; 88 *Atl. Rep.* 822, is controlling, but I do not consider the case as in point. An examination of the printed "state of case" in that case confirms the inference from the official report that the physician (Dr. Clark), who gave the objectionable testimony, was not a treating physician. He was a surgeon of the police department, who was at the time acting as an investigator at the request of two detectives, Donovan and Mahan, who asked him to "ascertain her physical condition," referring to the

abortee. (Pages 32, 33.) The abortee (Mrs. Goff) had previously testified in the case, but "her testimony had been very vague upon the question whether an abortion had or had not been performed." The investigator (Dr. Clark) was then called to the stand and was permitted to testify that the abortee told him that she "went to a midwife whose name is Alwine Ludwig," the defendant, who produced an abortion "by use of instruments," and that she felt "the introduction of some metal inside of her." (Page 37.) Such statements to an investigator for the police are obviously objectionable hearsay, the mere fact, standing alone, that the investigator was a physician, does not avail to take the case out of the category.

The defendant also cites *State* v. *Gedicke,* 43 *N. J. L.* 86, but I do not feel that this case either is in point. In the Gedicke case declarations of the alleged abortee (called "SS") made to a physician (Dr. Bleye) of "distinct charges of crime made against defendant," and of the "use of an instrument to procure her miscarriage" by defendant were permitted. (Page 94.)

Viewing the point in the instant case from a fresh aspect— The abortee, June Kowalski, testified fully and in detail that the defendant, after agreeing with her to abort her for $150 and after receipt of the money from her, had directed her to his office where he had inserted an instrument into her female organ, which later was followed by pain, bleeding, and a discharge, and her subsequent entry into the hospital for relief and treatment for her bleeding condition. Officer Birmingham testified, uncontradicted and without objection, that June Kowalski stated in his presence and in the presence of defendant that defendant had performed an abortion on her and that defendant made no reply.

In the face of all this testimony it is difficult to see how defendant could have been prejudiced by an additional statement of hers, *ex parte,* that she had had physical interference, without indication of any connection therewith by the defendant.

The third ground argued is that the court erred in its charge on the subject of the failure of defendant to take the stand in the following respect.

The court in its charge adverted to the testimony of the state's witness, the abortee, June Kowalski, wherein she testified to a conversation with defendant by which she made a bargain with defendant to abort her, that she agreed therein to pay him $150 for doing so, that she did pay him in his own hand that sum, and that he thereupon inserted an instrument into her private parts. Each one of these circumstances constituted a link in a chain or course of conduct, each act constituting an incriminating circumstance, and the court charged that defendant's failure to take the stand and deny this evidence raised a presumption that he could not do so. This seems well within the rule.

The fourth ground argued is that the court erred in refusing to charge request No. 6. The request is as follows:

"You must bring in a verdict of acquittal if you are satisfied that the abortion was the result of self infliction by instrument or otherwise or as the result of June Kowalski taking the six quinine pills accompanied with gin producing some bleeding."

The statute (*R. S.* 2:105–1; *N. J. S. A.* 2:105–1) does not require that the effort of the defendant be the cause of an abortion or that any abortion should actually follow his effort or that, if an abortion should follow his effort, his effort be the cause thereof. In the instant case, even if the pills were the cause of the abortion it would not necessarily avail defendant anything. What the statute contemplates is that the defendant unlawfully use an instrument upon a pregnant woman with intent to cause an abortion. Success or failure in his effort is not the measure of his criminality. As stated in *State* v. *Gedicke, supra,* in speaking of the statute, "The guilt of the defendant is not determined by the success or failure of the attempt." (Page 89.) Hence, defendant's request No. 6 was properly refused.

I find I have on the whole case no shadow of doubt in my mind of the guilt of the defendant upon the merits. I feel an abiding conviction that the technical grounds argued are without merit and that there is no prejudicial error in the record. The application must be denied.